SLAVICK, A MINOR, ET AL., APPELLANTS, *v.* THE STATE OF OHIO, DEPARTMENT OF TRANSPORTATION, DIVISION OF HIGHWAYS, ET AL., APPELLEES.

(No. 86AP-1057—Decided May 3, 1988.)

*Stephen J. Brown,* for appellants.
*Anthony J. Celebrezze, Jr.,* attorney general, and *Mark D'Alessandro,* for appellees.

BOWMAN, J. In the summer of 1983, appellee, Ohio Department of Transportation ("ODOT"), decided to resurface State Route 94 between Sharon Center and State Route 18. Accordingly, ODOT entered into a contract with the Lerkis Paving Company for surface repair and resurfacing operations. Work began on September 19, 1983, when "Road Construction Traffic Maintained" signs were placed at the beginning and end of the project, as well as at each intersecting road on the project.

State Route 94 is a straight, two-lane road with a mild upgrade which gives the appearance of being flat; however, the road has a dip which is not discernible to the naked eye and which creates a blind spot large enough to hide a motor vehicle. In October 1983, State Route 94 was planed by a machine which ground off the top one inch of the road surface. As a result, the solid yellow line denoting a no-passing zone was removed. The resurfacing of State Route 94 was done between October 19 and 26. Appellee permanently replaced the no-passing zone pavement markings on November 22, 1983, a day after appellee's safety inspector was made aware of the following events.

On November 19, 1983, appellant, Christopher Slavick, was driving northbound on State Route 94. He had previously picked up three friends, and they were on their way to Walsh College to play basketball and go swimming. Slavick was operating his vehicle in a reasonable and safe manner, traveling the posted speed limit of thirty-five m.p.h. He was traveling behind another vehicle which did not accelerate when the speed limit increased to fifty-five m.p.h., so Slavick decided to pass the vehicle. Slavick and the two back-seat passengers, Farriss and Hammers, looked out the window into the southbound lane and did not see anything indicating that it was not

safe to pass. As Slavick pulled around and alongside the vehicle he was passing, a southbound car popped out of the blind spot created by the dip in the road, and a head-on collision occurred. Slavick and his passengers were severely injured as a result of the accident.

Appellants filed a complaint in the Court of Claims alleging that appellee's negligence in maintaining the traffic control devices in the construction area was the proximate cause of Slavick's injuries.

At trial, Hammers testified that the road was clear, that he could see across the valley, and that there was nothing to indicate it was not safe to pass. Farriss testified that the southbound lane looked clear and that there was no oncoming traffic. Neither passenger was aware of the unmarked no-passing zone or the blind spot existing in the road. Due to the nature of his injuries, Slavick was unable to testify because he had no recollection of the events prior to the collision.

The investigating state trooper, Thomas Lemmon, testified that prior to the repaving project, there was a solid yellow no-passing line in place in the northbound lane of the area where the accident occurred; however, on the night of the collision, there was no solid yellow no-passing line in the northbound lane. Lemmon also testified that, but for the solid yellow line indicating a dangerous no-passing zone, there were no visual clues indicating the existence of the dip in the road. In addition, Lemmon's expert opinion indicated that the lack of a no-passing zone pavement marking contributed to the accident.

William Jackman, a professional engineer, testified that the signs that were erected on the road gave no warning whatsoever of an unmarked no-passing zone. In addition, Jackman testified that failure to replace the center line no-passing zone pavement markings at the end of each day's work did not meet the necessary standard of care. He added that the failure to do so was the proximate cause of the accident. It was Jackman's opinion that the Ohio Manual on Uniform Traffic Control Devices for Streets and Highways ("MUTCD") requires the installation of center line no-passing zone markings, denoted by a solid yellow line in the lane prohibited from passing, any time that a center line pavement marking is in place. However, if a compelling reason existed that would prevent the pavement markings from being replaced during construction, placing "No Passing" signs would be a reasonable safety alternative.

William Hogue, the appellee's safety inspector, testified that one of his duties during the construction project was to ensure motorist safety. Although he was aware of the blind spot, it did not occur to him that removing the no-passing zone pavement markings created a danger to motorists. He felt that the signs present on the construction site were sufficient even though they did not warn motorists of the dangerous no-passing zone; however, it was his opinion that erecting "Do Not Pass" or "No Passing" signs would have been appropriate in this situation and would not have interfered with the repaving project.

District engineer, Larry Stormer, testified that appellee had a duty to protect motorists in construction zones by giving them positive guidance and providing for their safety. He agreed that removing the pavement markings made the road more dangerous and that appellee had a duty to eliminate road hazards if feasible, and if it was not feasible to eliminate the hazards, appellee had a duty to guard against them. Stormer also testified that the use of "No Passing" signs would have

warned drivers of the no-passing zone regardless of whether the pavement markings were in place.

Robert Yankovich, a planning and design engineer from the Bureau of Traffic, testified that the signs and temporary road markings in place did not fairly and adequately warn the motoring public of the no-passing zone. However, Yankovich pointed to Section 7F-12 of the MUTCD as the basis for his position that appellee could obliterate the no-passing zone pavement markings during construction. That section states in pertinent part:

"* * * For surfacing operations where pavement markings are important to the definition of lanes and to the guiding of traffic along the path of the roadway, temporary pavement markings should be installed before nightfall. Permanent markings should be installed where applicable as soon thereafter as practicable.

"Where temporary pavement markings are used, they may be installed to a lesser dimensional standard than that specified for permanent markings. * * *

"* * *

"At locations where the duration of the temporary roadway is relatively short, pavement markings consisting of reflectorized paint lines may not be practical due to the time required and expense involved in their removal. Adequate short term expendable pavement markings can be provided by use of pressure sensitive traffic marking tape which is quickly and simply applied. * * *"

On October 23, 1986, the trial court entered its decision, including findings of fact and conclusions of law. The trial court found that Slavick was negligent and that his actions in passing the car were the proximate cause of his injuries. In addition, the court found that the state has a duty to exercise ordinary care to keep the highway free from obstructions and defects from which injuries might reasonably be anticipated. However, the court held that the state was not negligent in failing to place markings warning of the no-passing zone since there was no requirement mandating their placement. Accordingly, the court entered judgment in favor of the state.

Appellants now bring this appeal and assert the following assignments of error:

"1. The court erred in finding that defendant Ohio Department of Transportation was not negligent in failing to mark the highway as required by the Ohio Manual of Uniform Traffic Control Devices.

"2. The court erred in finding that the conduct of the Ohio Department of Transportation in placing a temporary center line on the highway without replacing the center line no-passing zone markings (solid yellow line) which it had previously removed or otherwise warning users of the highway of the existence of an unmarked no-passing zone by the use of adequate signs did not violate its duty of care to the users of the highway when, in fact, such conduct created a trap by causing an illusion of safety that, in the absence of any visible oncoming traffic, the area of the highway constituted a safe place to pass.

"3. The court erred in determining that had proper traffic control devices, in the form of warning signs and pavement markings been in place, it was mere speculation as to whether or not plaintiff would have followed them.

"4. The court erred in concluding, as a matter of law, that appellant was negligent and that his negligence was the proximate cause of the collision."

Appellants' first two assignments of error are interrelated and will be considered together. In these assign-

ments of error, appellants assert that the trial court erred in not finding that appellee had a duty to warn of the no-passing zone; that appellee breached this duty by obliterating the pavement markings on the road and not placing temporary, solid, no-passing lines on the road, or using signs to warn of the no-passing zone; and that the breach of this duty was the proximate cause of Slavick's injuries.

Pursuant to R.C. 5501.11, ODOT has a responsibility to construct and maintain state highways in a safe and reasonable manner. In *Knickel* v. *Dept. of Transp.* (1976), 49 Ohio App. 2d 335, 3 O.O. 3d 413, 361 N.E. 2d 423, this court found that although the state is not an insurer of the safety of its highways, the state has a duty to maintain its highways in a reasonably safe condition. ODOT also has the duty to adopt a manual[1] and specifications for a uniform system of traffic control devices, meaning all signs, signals, markings and devices placed or erected for the purpose of regulating, warning or guiding traffic, for use on the highways of the state. R.C. 4511.09, 4511.10 and 4511.01(QQ). This uniform system shall correlate with, and so far as possible conform to, the system which has been approved by the American Association of State Highway Officials. R.C. 4511.09. R.C. 4511.11(D) requires that all traffic control devices erected on a public road must conform to the state manual and specifications.

The MUTCD notes that construction areas can present unexpected or unusual situations for motorists, and as a result, special care should be taken in applying traffic control techniques in these areas. Section 7A-1. Ensuring adequate protection of the public will

dictate what measures need to be taken; however, safety should have a high priority through all stages of the work undertaken. Accordingly, good engineering judgment must be used to arrive at the best traffic controls for a particular work site, including taking into consideration the type of roadway and the potential hazard. The traffic control plan should include, but not be limited to, items such as signing and application and removal of pavement markings.

The MUTCD states:

"7A-5 General Requirements

"* * *

"(c) Motorists should be guided in a clear and positive manner while approaching and traversing construction and maintenance work areas.

"1. Adequate warning, delineation, and channelization by means of proper pavement marking, signing, and use of other devices which are effective under varying conditions of light and weather should be provided to assure the motorist of positive guidance in advance of and through the work area.

"* * *

"7C-1 Preface

"Regulatory signs shall be used to indicate to highway users that certain laws and regulations are enacted to promote safety * * *. They are essential in order to indicate to the motorists the applicability of legal requirements that would not otherwise be apparent. Great care must be exercised that they be erected wherever needed to fulfill this purpose * * *.

"* * *

"7C-3 Application of Regulatory Signs

"* * *

"* * * Certain roadways may temporarily require One Way signs, Do Not Enter signs, or Do Not Pass signs. * * *"

The plan specifications for the

---

[1] The manual referred to is the Ohio Manual of Uniform Traffic Control Devices for Streets and Highways ("MUTCD").

resurfacing of State Route 94 were in accordance with a General Note dated October 1, 1979, which stated:

"Effective immediately on all projects involving roadway improvements or resurfacing, the attached General Note will be utilized to assure minimum temporary pavement markings and markings for temporary roads will be provided during construction operations for the safety of the traveling public.

"Please keep in mind that these are *minimum* requirements, and traffic patterns on complex projects will warrant more complete temporary markings to assure optimum safety during construction operations." (Emphasis *sic*.)

Accordingly, the plan specifications required that temporary pavement markings were to be placed on the road. These temporary markings were to consist of "[c]enter lines and lane lines * * * of 12″ x 4″ segments spaced at a maximum 40′ center to center * * *" and were to conform to the State of Ohio Department of Transportation Construction and Material Specifications. That manual states:

"621.07 Lane Lines. Lane lines shall be white retroreflective stripes between contiguous lanes of pavement carrying traffic in the same direction. They shall be dashed unless specified solid. * * *

"621.08 Center Lines. Center lines shall be single or double yellow retroreflective stripes between contiguous lanes of pavement carrying traffic in opposite directions. * * * Each stripe shall be 4 inches wide, solid or dashed."

It also states:

"* * * Where the highway under construction is being used by through traffic, including periods of suspension of the work, the Contractor *shall* furnish and maintain pavement markings, lights, warning signs, road construction traffic maintained signs and end construction signs, barricades, temporary guardrail and such other traffic control devices, and watchmen and flaggers as may be necessary to maintain safe traffic conditions within the work limits.

"* * *

"When an existing signal operation must be interrupted for a period, the Contractor *shall* provide a temporary traffic control method approved by the Engineer." (Emphasis added.)

The plan specifications also stated:

"The temporary markings *shall be complete* on all pavement courses exposed to traffic at the end of each day's operation. Where permanent markings are called for in these plans, the contractor shall furnish and place the permanent markings within 30 calendar days, following completion of all surface courses in a single roadway or prior to the end of the construction season, whichever comes first." (Emphasis added.)

However, in contravention of these requirements, appellee negligently failed to supervise the contractor's placement of temporary markings which consisted only of a white dashed line, twelve inches by four inches, along the center of the road as each portion of the road was resurfaced.

This court finds that appellee did not comply with its own manual or the plan specifications with regard to placing temporary pavement markings, consisting of center lines denoted by single or double yellow lines and lane lines denoted by dashed or solid white lines, on the road. Appellee was required to provide a temporary traffic control method once the solid yellow no-passing pavement marking was removed. In addition, the temporary markings placed on the road at the end

of the day were to be *complete*. This means that *all* the pavement markings which were obliterated, including center lines and lane lines, were to be temporarily replaced at the end of each work day. In addition, the MUTCD mandates that warning signs shall be used in combination with temporary pavement markings.

"Warning signs are used to give notice of conditions that are potentially hazardous to traffic. They should be used when such conditions are real, particularly when the danger is not obvious or cannot be seen by the motorist. * * *" Traffic Control Devices Handbook[2] at 18.

Appellee's non-compliance with the mandates of the MUTCD and the plan specifications caused an unreasonable risk to motorists using the highway. The purpose of the solid yellow line no-passing zone placed by appellee is primarily to warn the driver, and secondarily to direct traffic. Accordingly, evidence that no steps were taken to warn of the hazardous condition created by eliminating the no-passing zone markings constitutes negligence on the part of the state, for which appellant can recover for his injuries. See, *e.g.*, *Moore* v. *Columbus* (1956), 74 Ohio Law Abs. 136, 139 N.E. 2d 656.

This court holds that appellee breached its duty to the operators of vehicles on this road when it failed to require the contractor to comply with its manual in placing temporary pavement markings, including lane markings, at the end of each day as required by the plan specifications and appellee's manual, or by not supplementing these markings with warning signs. At the very least, appellee should have placed "Do Not Pass" or "No Passing" signs to warn travelers of the unseen dangers in the road. This duty to warn is especially important where the situation is inherently dangerous, such as where there are obstructions, dips or hidden defects in the road of which a traveler would be unaware except for the markings.

Unless a more serious situation requires appellee's attention and it is not reasonably possible to meet both, no situation as dangerous as the one in the case at hand, where a dip in the road and the hazards of passing are so inherent, should be handled in so cavalier a manner. Absent any such showing, appellee is negligent in not requiring the contractor to follow its manual to take safety measures admittedly necessary for the safety of the traveling public.

Therefore, this court holds that the state was negligent in not requiring the contractor to follow its manual and plan specifications mandating the contractor to place temporary markings on the road to ultimately warn motorists of the hazardous, dangerous condition in the roadway. Accordingly, appellants' first two assignments of error are well-taken and are sustained.

In their third assignment of error, appellants contend the trial court erred in determining that had proper traffic control devices been in place, it was mere speculation whether or not Slavick would have followed them. This court disagrees. Although there is a presumption that an operator of a motor vehicle will obey traffic control devices, it is impossible for a court to determine whether or not Slavick would have acted differently if circumstances were changed and proper traffic control devices were in place.

A presumption requires the trier of fact to use one or more underlying facts to presume some other fact unless and until other evidence rebuts that presumed fact. In the case at bar,

---

[2] This handbook is an operating guide intended to supplement the MUTCD.

there is evidence that Slavick was driving in a reasonable and safe manner and was going the appropriate speed limit. However, there is also evidence that Slavick wrongfully ascertained it was safe to pass the vehicle it was traveling behind. This evidence rebuts the presumed fact that Slavick would have continued in a lawful manner had the appropriate traffic devices been in place. Since neither this court nor any other court can determine what actions Slavick would or would not have taken had the appropriate markings been in place, the trial court did not err in finding: "To say that if additional signs or markers would have been seen, they would have been heeded is mere speculation." The fact that Slavick had proceeded lawfully prior to his passing the vehicle must be weighed against appellee's failure to properly mark the roadway in determining which party's negligence was more responsible for the accident. See R.C. 2315.19. In comparing negligence, it should be noted that pursuant to R.C. 4511.31, an operator of a vehicle must obey the directions of "No Passing" signs and markings only when they are clearly visible. See, *e.g., Becker* v. *Nold* (1973), 35 Ohio App. 2d 1, 64 O.O. 2d 109, 299 N.E. 2d 299, wherein the court held that where a stop sign has been removed so that it is no longer visible, the operator of a motor vehicle who is without knowledge of its existence is not required by law to stop.

Accordingly, appellants' third assignment of error is not well-taken and is overruled.

In their fourth assignment of error, appellants allege that the court erred in concluding that Slavick was negligent and that his negligence was the proximate cause of the collision.

Slavick was required to use ordinary care in traveling in a construction zone. Although Slavick is not bound to anticipate or foresee a danger which is unknown to him and which he cannot see or appreciate, Slavick is bound to refrain from passing another vehicle unless the left side of the roadway is clearly visible and free from oncoming traffic. See R.C. 4511.29. In addition, Slavick is bound by R.C. 4511.30(A), which prohibits driving on the left side of the roadway when approaching the crest of a grade or where the operator's view is obstructed within such a distance as to create a hazard. However, this does not determine the extent of Slavick's liability, if any, under comparative negligence principles since appellee was also negligent in failing to properly mark the road and in failing to warn of the hazardous no-passing zone and the dip in the road.

Therefore, to the extent that the trial court concluded Slavick's negligence was the proximate cause of his injuries, appellants' fourth assignment of error is sustained. Given this court's disposition of appellants' first two assignments of error, the court will have to determine on remand the amount of each party's negligence pursuant to R.C. 2315.19.

Accordingly, for the foregoing reasons, appellants' first, second and fourth assignments of error are well-taken and are sustained. Appellants' third assignment of error is not well-taken and is overruled. This cause is reversed and remanded to the trial court for disposition in accordance with this opinion.

*Judgment reversed and*
*cause remanded.*

REILLY, J., concurs.

JONES, J., concurs separately. See *infra* at 138.