[Cite as *Sparre v. Dept. of Transp.*, 2012-Ohio-3679.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

MATTHEW SPARRE, etc., et al.

    Plaintiffs

    v.

DEPARTMENT OF TRANSPORTATION

    Defendant

Case No. 2010-02286

Judge Joseph T. Clark

DECISION

{¶ 1} Plaintiffs brought this action against the Ohio Department of Transportation (ODOT) alleging claims of negligence, wrongful death, and loss of consortium on behalf of themselves and the heirs of decedent, Kimberly Sparre.[1] The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} This case arises out of a motorcycle accident that occurred on Friday, June 20, 2008, on State Route (SR) 536 in Monroe County, Ohio.[2] On Thursday, June 19, Sparre, Richard Avery, and David Kramer, who were all members of the Christian Motorcycle Association, traveled from Michigan to Marietta, Ohio, for a weekend excursion of riding motorcycles in southeastern Ohio. They drove to Marietta and towed their motorcycles in a trailer. Sparre had approximately 50 years of experience riding motorcycles at the time but Kramer was a novice rider. On June 20, the group began the ride in a staggered formation with Avery in the lead position riding close to the

---

    [1]Plaintiff Matthew Sparre was appointed executor of his father Kimberly's estate. Plaintiff Bonnie Sparre is Kimberly Sparre's widow.

    [2]All dates in the months of May and June refer to the year 2008.

center line, Sparre in the middle position riding on the right side of the travel lane near the white edge line, and Kramer in the rear position near the center line. The group proceeded southbound on SR 536, a two-lane, scenic roadway. At the time of the accident, the weather conditions were sunny and clear.

{¶ 3} Avery testified that he was traveling approximately 30 miles per hour (mph) when he came upon a raised area in the asphalt of the southbound lane of SR 536 near mile marker 5.98. The speed limit in that area was 55 mph. Avery testified that the raised area caused him difficulty in controlling his motorcycle as he traversed it. After Avery encountered difficulty, he glanced in his rear-view mirror and saw Sparre come around the corner near the top of a hill, but as Sparre rode into a shaded area, Avery lost sight of him. Avery then stopped at the bottom of the hill, turned around and traveled in the opposite direction. Avery saw Sparre's motorcycle lying in the southbound lane of SR 536 and found Sparre's body lying under a guardrail. Kramer then came upon the accident scene. A passing motorist in a pick-up truck stopped to assist the group. They attempted to call for assistance but encountered difficulty with cell-phone service so they decided to place Sparre's body in the back of the truck and drive to the hospital. After traveling approximately three miles, an ambulance with paramedics arrived. Sparre was pronounced dead by the paramedics. Toxicology tests showed that no alcohol or drugs were in Sparre's system.

{¶ 4} Plaintiffs assert that defendant was negligent in that it both failed to maintain SR 536 in a reasonably safe condition for the motoring public, and that the signage in place in the vicinity of mile markers 5.9 and 5.98 was inadequate to warn of the condition of the roadway. Plaintiffs assert that defendant knew that the area where the accident occurred was located on a "slip", a condition where the terrain beneath the roadway on a hillside erodes and causes the asphalt to become unstable. Plaintiffs assert that defendant's negligence was the proximate cause of Sparre's death. Defendant contends that it did not have actual or constructive notice of the particular hazard in the roadway. Defendant further argues that it is not liable based upon the doctrine of discretionary immunity.

{¶ 5} "To maintain a wrongful death action on a theory of negligence, a plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that

duty, and (3) proximate causation between the breach of duty and the death." *Littleton v. Good Samaritan Hosp. & Health Ctr.*, 39 Ohio St.3d 86, 92 (1988), citing *Bennison v. Stillpass Transit Co.*, 5 Ohio St.2d 122 (1966).

{¶ 6} Defendant has a general duty to maintain its highways in a reasonably safe condition for the traveling public. *Knickel v. Ohio Dept. of Transp.*, 49 Ohio App.2d 335 (10th Dist.1976). However, defendant is not an insurer of the safety of its highways. *See Rhodus v. Ohio Dept. of Transp.*, 67 Ohio App.3d 723 (10th Dist.1990). It is well-settled that ODOT may be subject to liability for its failure to exercise reasonable care in maintaining state highways. *White v. Ohio Dept. of Transp.*, 56 Ohio St.3d 39, 42 (1990). However, ODOT is not liable for damages caused by dangerous conditions on state highways unless it has actual or constructive notice of the precise condition alleged to have caused the injuries in question. *Manning v. Ohio Dept. of Transp.*, 10th Dist. Nos. 96API07-931, 96API07-932, 96API07-937 (April 24, 1997), citing *McClellan v. Ohio Dept. of Transp.*, 34 Ohio App.3d 247, 249 (10th Dist.1986). The distinction between actual and constructive notice is in the manner in which notice is obtained rather than in the amount of information obtained. Whenever the trier of fact is entitled to find from competent evidence that information was personally communicated to or received by the party, the notice is actual. Constructive notice is that notice which the law regards as sufficient to give notice and is regarded as a substitute for actual notice. *In re Estate of Fahle*, 90 Ohio App. 195, 197 (1950). "In order for there to be constructive notice of a nuisance or defect in the highway, it must have existed for such length of time as to impute knowledge or notice." *McClellan*, *supra,* at 250.

{¶ 7} On the day of the accident, Ohio State Highway Patrol (OSHP) Trooper Ralph Hendershot and Sergeant Donald Britton arrived at the location where the ambulance and pick-up truck had stopped. They initiated an investigation which included interviewing witnesses and taking photographs. Trooper Roger Clark also answered an emergency call and went directly to the accident scene on SR 536 and began his investigation by taking both photographs and measurements. Kramer and Avery also returned to the accident scene at approximately 4:00 p.m. the same day to take photographs of the condition of the roadway.

{¶ 8} Sgt. Britton and Troopers Hendershot and Clark testified that they each drafted different portions of the traffic crash report (Plaintiffs' Exhibit 27). Trooper Hendershot and Sgt. Britton took measurements of the slip in the roadway, which Trooper Hendershot described as a dip approaching a downhill grade. Trooper Hendershot noted that a southbound motorist would have encountered a 4.5-inch dip spanning the entire southbound lane which he characterized as a hazard to motorists. Trooper Hendershot and Sgt. Britton stated that the photographs do not depict the severity of the defect in the roadway and noted that the slip went into a left curve downhill. In Trooper Hendershot's opinion, Sparre was involved in a low-speed crash caused by the condition of the roadway. Trooper Clark concluded that Sparre had ridden across that section of the roadway at a lawful speed, that he lost control of his motorcycle, and that his body came into contact with the guardrail. Trooper Clark stated that the condition of the roadway presented a hazard for a motorcycle but that a car probably would have been able to traverse the area without losing control.

{¶ 9} Plaintiffs' expert, Frederick Lickert, testified that he was a full-time accident reconstructionist and that he has ridden motorcycles for 40 years. Lickert testified that one difference between driving a car and riding a motorcycle is that a motorcycle rider must lean his body to turn the motorcycle. Lickert testified that defects on a roadway can be more hazardous to motorcycle riders than to drivers of four-wheel motor vehicles. Lickert opined that the slip on SR 536 was the proximate cause of Sparre's death, and noted that shadows on the roadway from the trees adjacent to the curve camouflaged the defect. Lickert opined that there was no appropriate signage in place to warn of the slip but that a "rough road" sign with an advisory speed limit placed in advance of the slip would have been appropriate. Lickert criticized the use of a "landslides" sign that existed at mile marker 6.074 because it did not specifically warn of a slip. Lickert further stated that there was no evidence at the scene to suggest that Sparre had been speeding.

{¶ 10} Timothy Tuttle, defendant's expert, testified that he was a traffic crash reconstructionist. The court found that Tuttle was not qualified to render an expert opinion as to the speed of Sparre's motorcycle because he had calculated the speed based upon his evaluation of the injuries that Sparre had sustained when his body came

into contact with the guardrail. The court noted that Tuttle's training in accident reconstruction did not render him qualified as an expert with regard to the nature and extent of Sparre's injuries. Tuttle's testimony with regard to the estimated speed of Sparre's motorcycle was stricken, and the court further found that speed was not material in this case because the speed limit was 55 mph in the area where the accident occurred, and all witnesses testified that Sparre had been traveling under the speed limit. Thus, the court found that Sparre's speed was not relevant to the issue of proximate cause.

{¶ 11} Upon review of the evidence, the court finds that plaintiffs have proven, by a preponderance of the evidence, that a hazardous condition existed on SR 536 on June 20, that Sparre was traveling at a speed lower than the posted speed limit, that he lost control of his motorcycle while traversing the hazard, that the hazard caused his body to come into contact with the guardrail, and that the injuries he sustained caused his death. In other words, the court finds that the hazardous condition of the roadway that existed on June 20 was the proximate cause of Sparre's injuries.

{¶ 12} The question becomes whether ODOT had actual or constructive notice of the precise condition of the hazard as it existed on June 20. Plaintiffs assert that an e-mail dated May 2 from Robert Roush to Jeff Schenerlein proves that ODOT had actual notice of the existence of the hazard prior to Sparre's accident. Plaintiffs also assert that ODOT oversaw highway striping on June 17 and that ODOT allowed the paint to be applied over the defect that existed in the same condition that it did on the date of the accident.

{¶ 13} Robert Roush testified that he was a Transportation Engineer for ODOT and that he had been a professional engineer for 25 years. Roush testified that he drafted an e-mail on May 2, 2008, to Jeff Schenerlein wherein he requested that Schenerlein provide him with the two slip locations in District 10 that should be submitted to the Geological Site Management (GSM) program for fiscal year 2012.[3] (Plaintiffs' Exhibit 1J.) Roush explained that ODOT maintains a GSM listing for areas on state roadways that are in need of a permanent repair. Roush described the permanent repair process for a slip as a drill shaft retaining wall accompanied by steel

---

[3]Monroe County is part of ODOT District 10.

beams that are filled with concrete. Roush noted that there are approximately 150 sites on the GSM list and that a certain ODOT committee in Central Office determines what conditions are placed on the list and when the permanent repairs are scheduled. Roush noted that the committee prioritizes the conditions on the list and schedules them for repair when funds become available each year. Roush stated that the slip at mile marker 5.9 was on the list prior to Sparre's accident. Roush stated that after the accident, an asphalt patch was placed as an interim repair until a permanent repair could be performed.

{¶ 14} Jeff Schenerlein testified that he was the County Manager for Monroe County. Schenerlein stated that he directed Darren Hendershot, another ODOT employee, to take photographs of the roadway on June 20 (Plaintiffs' Exhibits 3-26) and that as depicted, the defects in the roadway represented a hazard to the motoring public. Schenerlein acknowledged that ODOT knew that there had been a history of slips in that area for a couple of years prior to the accident, and that ODOT had made repairs but the repairs would not hold. Schenerlein stated that the slips on SR 536 in that area had been on a list to be repaired with drilled shafts but that approval of those repairs was awaiting availability of funds and that Central Office would make that determination. Schenerlein stated that on May 2, Robert Roush had requested that he identify any slips in the area that warranted a permanent repair and that he identified two slips, one of which was the slip at the 5.9 mile marker. Schenerlein explained that he identified those two slips because he felt he could not fix those two with the equipment that he had. However, Schenerlein stated that he did not have notice prior to the accident that the slip at mile marker 5.98 was in the state of disrepair depicted in the photographs. Schenerlein estimated that there were 50 slip locations in Monroe County due to the topography that exists in that area.

{¶ 15} Schenerlein explained that he performs inspections of all of the roads in Monroe County twice monthly to look for defects and areas where maintenance needs to take place; that on June 9, 2008, he was in the area on SR 536 and noted no deficiencies in that area; and that if the slip had been in the condition that it was on June 20 when he did his inspection on June 9, he would have immediately placed cones and barrels to block it off from traffic and probably would have filled it with asphalt.

Schenerlein noted that ODOT had no record of any prior complaints from the public about the area.

{¶ 16} With regard to the striping that was conducted on June 17, Schenerlein stated that it would be inappropriate for one of his employees to ride with a paint crew and allow them to paint over the defect if the defect on June 17 were in the same condition that it was on June 20.

{¶ 17} Darren Hendershot testified that he was a Transportation Manager for Monroe County and that Schenerlein was his direct supervisor. Hendershot testified that as part of his duties for highway maintenance, he inspected SR 536 on June 2 and at that time there was no hazard on the roadway. Hendershot stated that striping was done on SR 536 after his inspection, and that painting is performed through the ODOT construction department. Hendershot was not aware that striping had been performed on SR 536 until he was on site taking pictures on June 20. Hendershot testified that he could not discern whether white paint had been applied over the defect.

{¶ 18} Gary York testified that he was a Highway Technician/Inspector in 2008 for Meigs County and District 10 and that his duties included accompanying construction crews to make sure that they were performing work that complied with ODOT's standards. York stated that he was present while striping was being performed on June 17, 2008. York stated that on June 17, he did not see any defect that concerned him on SR 536. York added that if the area on SR 536 appeared as it is depicted in the accident photos, he would have blocked off the roadway and called for an immediate repair. However, according to York, the defect in the roadway did not exist on June 17. York admitted that he allows crews to paint over one-inch cracks in roadways, and that there are one-inch cracks all over the state of Ohio. However, York was adamant that he would not have allowed a crew to paint over a defect such as that depicted in the photographs of the accident scene.

{¶ 19} Kathy Hoskins testified that she is a Highway Technician 2 for ODOT in Monroe County, that she has worked for ODOT for 19 years, and that Schenerlein is her direct supervisor. Hoskins has lived on SR 536 near mile marker 3 in Clarington, Ohio for the past 50 years. In the summer months, Hoskins travels on SR 536 and passes through the area where the accident occurred on her way to and from work. In June

2008, she worked four, ten-hour days. Hoskins worked on Thursday, June 19, but did not work on Friday, June 20. Hoskins testified that when she traveled to and from work on SR 536 on June 19, the condition depicted in the photographs of the accident scene did not exist. Hoskins testified that before the accident she noticed a crack in the berm of the roadway, but that the crack was not on the traveled portion of the roadway.

{¶ 20} Plaintiffs' other expert, John Robertson, testified that he is a civil engineer with 45 years of experience in highway construction. Robertson visited the accident scene in August 2010. Robertson explained that slips develop when water gets under pavement and gravity from the natural slope in the terrain causes the pavement to slip. In Robertson's opinion, slips should be repaired immediately because they get worse without a permanent repair. Robertson stated that based upon his review of the materials, including Plaintiff's Exhibit 1J, that two slips were in existence on SR 536 at or around mile marker 5.9. Robertson stated that it was foreseeable that a permanent repair was needed in the location of the accident. Robertson stated that if a permanent repair could not have been performed, defendant should have placed signage to warn of a rough road ahead or to reduce the speed in that area. Robertson stated that the 25 mph advisory sign that was in place at mile marker 6.276 warned only of curves, not of the slip. Robertson recommended that additional speed advisory signs should have been placed 300 feet ahead of the slip. Robertson also stated that the landslide sign that was in place at mile marker 6.074 was not an appropriate warning of the slip, because a landslide sign sends a message of falling rocks and does not adequately warn of rough pavement.

{¶ 21} According to Robertson, on June 17, the painting crew painted over the slip, based upon the photographs of the white edge line taken on the day of the accident. Robertson opined that it was foreseeable that the slip, identified in May, would continue to worsen unless defendant performed a permanent repair. Robertson conceded that a slip can occur within hours or days, but stated that the slips in this case existed on May 2, 2008.

{¶ 22} David Ray, defendant's other expert, testified that he is the State Maintenance Engineer for ODOT. Ray explained that there are two different inspection methods that ODOT uses. State-wide inspections are conducted by Maintenance

Quality Inspectors who review all of Ohio's state roadways on an annual basis to identify pavement deficiencies. Ray described the state inspections as a long-range planning tool. The second inspection method is informal and is made by the county level managers on a daily basis.

{¶ 23} Ray explained that highway technicians are trained to report any problems that they encounter on the state roadways to their managers. In addition, he noted that the traveling public may call, e-mail, or write ODOT to report a problem with the roadways. Ray stated that once a slip is reported to the GSM listing, a geotechnical engineer examines all of the slips in the district to prioritize which slips are scheduled for a permanent repair. With regard to signage, Ray stated that there was no appropriate sign to warn of the condition that existed on June 20; that a "rough road" or "uneven pavement" sign would not be used to warn of such a defect. Ray stated that the condition of the roadway that existed on June 20 would warrant an immediate patch once it had been discovered. After reviewing ODOT's maintenance records, Ray opined that ODOT had met the standard of care in this case in that its employees complied with the maintenance and inspection requirements, and that the condition of the roadway as it existed on June 20 was not reported to ODOT prior to Sparre's accident.

{¶ 24} Upon review of the evidence presented, the court finds that although ODOT identified a slip on SR 536 on May 2 and placed it on the GSM list for permanent repair, the roadway in the vicinity of the slip on May 2 was not in the hazardous condition depicted in the photographs taken on June 20. ODOT performed inspections of SR 536 on June 2 and 9, and no significant defects were noted in the roadway. The court finds that the testimony of York was credible that the roadway on June 17 was not in the condition as depicted in the accident photos. The court further finds that plaintiffs' assertions that ODOT allowed white edge lines to be painted over the defect as it appeared on June 20 are not supported by the evidence. Hoskins also testified credibly that when she drove to and from work on June 19, SR 536 was not in the condition depicted in the photographs. In addition, Robertson acknowledged that a slip can develop within hours. Accordingly, the court finds that plaintiffs have failed to prove that the defect in the roadway existed for such length of time as to impute knowledge or

notice to ODOT. Therefore, plaintiffs have failed to prove that ODOT had either actual or constructive notice of the precise condition of the roadway that caused Sparre's death.

{¶ 25} In addition, it is well established that "[t]he state cannot be sued for its legislative or judicial functions or the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Reynolds v. State*, 14 Ohio St.3d 68, 70 (1984); *Pottenger v. Ohio Dept. of Transp.*, 10th Dist. No. 88AP-832 (Dec. 7, 1989). ODOT's decision as to when to implement a permanent repair for a known slip, based upon available funds, is clearly an engineering judgment decision of such nature. The court concludes that ODOT is entitled to discretionary immunity for its decisions surrounding the GSM listing and when to schedule permanent repairs for conditions on the list.

{¶ 26} "The Ohio Manual of Uniform Traffic Control Devices for Streets and Highways (MUTCD) has been adopted as the state's official specifications for highway signs and markings pursuant to the mandate of R.C. 4511.09. R.C. 4511.10 requires ODOT to comply with the MUTCD in erecting and maintaining highway signs and markings." *White*, *supra*, at 41, citing *Slavick v. Ohio Dept. of Transp.*, 44 Ohio App.3d 19, 22-24 (1988); *Pierce v. Ohio Dept. of Transp.*, 23 Ohio App.3d 124, 127-128 (1985). Plaintiffs have not proven by a preponderance of the evidence that the signage in place on SR 536 on June 20, 2008 failed to comply with the MUTCD. Therefore, plaintiffs' claim of negligence based upon defendant's failure to place appropriate signage must also fail.

{¶ 27} With respect to plaintiffs' claims for loss of consortium, such claims are "derivative in that the claim is dependent upon the defendant's having committed a legally cognizable tort upon the spouse who suffers bodily injury." *Bowen v. Kil-Kare, Inc.*, 63 Ohio St.3d 84, 93 (1992). Since plaintiffs have failed to prove negligence on the part of defendant, the loss of consortium claims also must fail.

{¶ 28} For the foregoing reasons, the court finds that plaintiffs have failed to prove any of their claims by a preponderance of the evidence and, accordingly, judgment shall be rendered in favor of defendant.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

MATTHEW SPARRE, etc., et al.

    Plaintiffs

    v.

DEPARTMENT OF TRANSPORTATION

    Defendant

Case No. 2010-02286

Judge Joseph T. Clark

<u>JUDGMENT ENTRY</u>

{¶ 29} This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiffs. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
JOSEPH T. CLARK
Judge

cc:

Daniel S. Cody
James S. Casey
Michael M. Djordjevic
Peter W. Marmaros
17 South Main Street, Suite 201
Akron, Ohio 44308

Eric A. Walker
Stephanie D. Pestello-Sharf
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

002
Filed March 29, 2012
To S.C. reporter August 15, 2012